**MARITIME OVERSEAS CORPORATION,**
Appellant,

v.

**Richard ELLIS, Appellee.**

No. C14–91–00795–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 28, 1994.

Rehearing Overruled Sept. 1, 1994.

Thomas B. Greene, III, Maureen McPherson Spector, Linda Broocks, Marc Antonetti, Jane Nenninger, Houston, for appellant.

John O'Quinn, Gary M. Riebschlager, Houston, for appellee.

## CORRECTED MAJORITY OPINION ON MOTION FOR REHEARING EN BANC

DRAUGHN, Justice.

In this Jones Act, general maritime case, the trial court after a jury verdict entered judgment for personal injury damages to Richard Ellis. Appellant, Maritime Overseas Corporation, in fifteen points of error, raises legal and evidentiary challenges to the actual and punitive damages awarded, and to the exclusion of certain evidence. We affirm the judgment in part and reverse and render in part.

The central issue in this case is one of first impression because it requires us to examine the issues of causation and damages as to a toxic tort in the context of a Jones Act, General Maritime case tried in state court. To assist us in our determination, we have been favored with outstanding legal briefs, oral arguments, and developing case law by both parties. From these and the record, it is clear that an essential part of our appellate task, is to examine the standard for reviewing the weight and credibility of expert witness testimony under federal and state law. To properly review this and the other evidentiary issues raised, we must first place them in the relevant factual setting.

Appellee was a steward's assistant aboard the S/T OVERSEAS ALASKA. On August 27, 1982, the chief steward, in order to combat a roach problem, sprayed an industrial strength pesticide, Diazinon, in the galley, pantry, and dry storeroom without diluting it at the proper ratio of fifty parts water to one part concentrate. It was excessively applied by the chief steward in a small enclosed pantry room which had no ventilation and other nearby areas. The next morning, crew members noticed a strong odor of insecticide, and when the captain learned of this misapplication, he ordered the pantry and other areas to be cleaned so as to remove the chemical. Appellee participated in this clean-up for approximately five hours without being furnished any inhalation protective gear, nor any gloves or other gear to protect his hands, arms, or other skin areas from contact with the insecticide. Expert testimony would later reflect that appellee was exposed to levels of 100 to 200 times that considered safe for human exposure. Subsequent to this intense exposure, appellee began experiencing symptoms of nausea, headache, and eye problems. When the ship reached port in New Orleans two days later, appellee received treatment at the New Orleans General Hospital emergency room.

The hospital records showed a diagnosis of organophosphate exposure with findings of myosis with pupil constriction, muscle twitching and muscle weakness along with other symptoms. Diazinon is a member of this family of chemical compounds known as organophosphates, which have been shown to be toxic to humans in varying degrees. The emergency room doctor, testified later that on a scale of 1 to 10, with 10 representing death and 1 as completely normal, appellee suffered organophosphate exposure at a level of 6 to 7. During this initial visit to the hospital, appellee was given blood tests which reflected that his blood and serum levels of an essential enzyme, acetylcholinesterase, also called cholinesterase, was below normal. Cholinesterase is essential to the human nervous system because it enables messages to be transmitted normally from one nerve to another. Appellee's red blood cell level of cholinesterase was .40, while the average range for men of appellee's age is .44 to 1.09. His serum level of cholinesterase was .53 or

.54, while the average range is 1.90 to 3.80. Later expert testimony concluded that these clinical findings and other symptoms reflected neurotoxic nerve impairment and damage from organophosphate poisoning. However, appellee was not hospitalized at New Orleans General Hospital. He was given medication for eye problems and advised to return for a follow-up visit. He returned to his ship and continued to experience problems. One month later he saw another doctor for continuing problems with his eyes. He continued to work as a crew member for the remainder of 1982.

In June 1983, appellee filed suit against appellant under the Jones Act, 46 U.S.C.A.App. § 688 (1988)[1] alleging gross negligence, and under general maritime law alleging unseaworthiness. Appellee claimed that he was suffering from delayed neurotoxic effects caused by the exposure to Diazinon. Appellee's deposition testimony and the testimony regarding his medical records indicate that appellee continued to suffer from eye problems, that he had trouble sleeping, that he was depressed, anxious, and had memory problems, that he had high blood pressure, and that he suffered gastrointestinal problems. Appellee's wife testified that appellee was depressed, more irritable, had headaches, muscle weakness, memory problems, and had been unable to hold a job.

The jury found in favor of appellee on both claims and awarded appellee approximately $8,576,000.00 in actual damages, $1 million in punitive damages, and $1 million in exemplary damages for failure to pay maintenance and cure. The trial court awarded appellee an additional $1,871,728.00 in prejudgment interest, making a total of approximately $12.6 million.

In point of error one, appellant contends the trial court erred in denying appellant's motion for a new trial because there is insufficient evidence to support the jury finding that appellee suffered $8,576,000.00 in actual damages. Appellant concedes that appellee suffered short-term effects from the exposure to Diazinon and, in effect, that overexposure to Diazinon is toxic to humans and can cause damage to the nervous system on some temporary basis. Thus, appellant does not contest damages for the medical treatment appellee received in New Orleans in 1982 or for the loss of two days of work. Appellant does contest damages awarded for appellee's claim of delayed and permanent neurotoxic damage on the ground that appellee's expert testimony was speculative and not based on reasonable medical probability. Essentially, appellant's attack is directed at the issue of causation as to the delayed and permanent damage found by the jury based on the circumstantial and expert evidence before them.

Before examining the expert evidence challenged by this point, the parameters of our appellate review should be examined. It is axiomatic that a trial court has wide discretion in granting or denying a motion for new trial. *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988). We must uphold the trial court's decision absent a showing of a manifest abuse of discretion. *Id.* Because appellant contends there was factually insufficient evidence to support the award of damages, we must consider, but not necessarily detail in this opinion, all of the evidence both supporting and contrary to the judgment. *Plas–Tex., Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). We may set aside the verdict only if the evidence is too weak to support the damages, or if the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). The applicable standard is determined by which

1. The Jones Act provides:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such actions all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury shall apply; and in cases of death of any seaman as a result of any such personal injury the personal representative of the seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes conferring or regulating the right of action for death in the case of railway employees shall be applicable....

party has the burden of proof on the challenged issue. *Raw Hide Oil & Gas v. Maxus Exploration*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied).

Appellant asserts that we must apply federal law to this case because appellee's causes of action are both federal causes of action. The Texas supreme court has stated:

> Where applicable *and* properly invoked, general maritime law preempts state causes of action and remedies, consistent with the long standing desire of Congress and the judiciary to achieve uniformity in the exercise of admiralty jurisdiction.

*Texaco Refining & Marketing v. Estate of Dau Van Tran*, 808 S.W.2d 61, 64 (Tex.1991), *cert. denied*, 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 245 (1991). In *Texaco*, the court was determining whether a plaintiff could recover mental anguish damages, allowed under state law, but prohibited under general maritime law. *Id.* at 63. Because the court found that the plaintiff had properly invoked remedies under general maritime law, the court reversed the award of damages for mental anguish. *Id.* at 64. Although we do not interpret this case to hold that a state court entertaining a Jones Act or general maritime cause of action may only look to federal case law for guidance.[2]

To the extent that state law and federal law do not materially conflict or there is a vacuum in one or the other, both may be considered. However, it is clear from our interpretation of the law, that in questions of the sufficiency of the evidence in Jones Act cases, we must be guided by federal law. Appellant and appellee agree that substantive federal law should apply, but not as to what the federal standard is. To determine the Jones Act standard of review, we must do so analogously via cases under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., because the Jones Act specifically incorporates the rights and remedies available to railway workers under the FELA. It is firmly established that questions of sufficiency of evidence for the jury in cases arising under the FELA in state courts

are to be determined by federal law, and a jury's verdict on liability issues in FELA cases, whether for the employer or employee, cannot be reviewed on appeal using local "weight and sufficiency standards." *Texas and Pacific Railway Co. v. Roberts*, 481 S.W.2d 798, 800–801 (Tex.1972). The test was stated in the landmark case of *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957):

> Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury or death for which damages are sought. (emphasis added).

This specific language was cited with approval and was applied to Jones Act cases in *Ferguson v. Moore–McCormick Lines, Inc.*, 352 U.S. 521, 522–23, 77 S.Ct. 457, 458, 1 L.Ed.2d 511 (1957). And the U.S. Supreme Court has repeatedly held that the FELA and the Jones Act are co-equal statutes which are to be interpreted and applied in the same way. *Kernan v. American Dredging Co.*, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). We accordingly followed this line of reasoning as to causation in a Jones Act case in *Brown & Root, Inc. v. Wade*, 510 S.W.2d 408, 410 (Tex.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.); *see also Nobles v. Southern Pacific Transportation Co.*, 731 S.W.2d 697 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

The plaintiff's negligence and causation burden in Jones Act cases has been characterized as very light, even "featherweight." *Smith v. Trans–World Drilling Co.*, 772 F.2d 157, 162 (5th Cir.1985); *Rogers v. Eagle Offshore Drilling Services, Inc.*, 764 F.2d 300, 304–05 (5th Cir.1985); *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984); *Chisholm v. Sabine Towing & Transportation, Co., Inc.*, 679 F.2d 60, 62 (5th Cir.1982) and Gilmore & Black, The Law of Admiralty, p. 377 (2d Ed.1975).

Appellant, however asserts that the federal standard of review for causation involving a toxic chemical is that set out by the U.S.

---

2. Indeed, the Texas Supreme Court has recently held that federal maritime law does not preempt the State's limitations on its consent to be sued.

*State Dept. of Highways v. Dopyera*, 834 S.W.2d 50, 53 (Tex.), *cert. denied*, —— U.S. ——, 113 S.Ct. 636, 121 L.Ed.2d 567 (1992).

Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and infers from that opinion a far stronger standard for Jones Act cases. *Daubert* involved a federal diversity suit originating in California. Plaintiffs, two minor children and their parents, sued, alleging serious birth defects had been caused by the mother's prenatal use of Benedectin, a drug designed to prevent morning sickness. The Supreme Court reversed a summary judgment which had been entered against the Dauberts, and ruled that (1) "general acceptance" is not a necessary precondition to admissibility of scientific evidence under Federal Rules of Evidence, and (2) Federal Rules assign to the trial judge the task of ensuring that expert testimony is reliable and relevant. *Id.* —— U.S. at ——-——, 113 S.Ct. at 2794-96. It put to rest the notion that the so-called *Frye* rule superseded the Federal Rules of Evidence as to the admissibility of expert opinion evidence. *Id.* The *Frye Rule,* in existence for 70 years, held that expert opinion evidence must have gained general acceptance in the field in which it belongs to be admissible. *Frye v. United States,* 293 Fed. 1013, 1014 (D.C.Cir. 1923). In essence, *Daubert* says that the only real judicial justification for excluding expert testimony is for the federal trial courts to consider the relevance and reliability of expert opinion evidence in a liberal fashion as required by the Federal Rules of Evidence. *Id.*

We find nothing in the *Daubert* case which eliminates the "featherweight" burden of proof in a Jones Act case to establish negligence and causation. And we find that in the case before us, unlike *Daubert,* the question of admissibility of the expert testimony is moot. Appellant levied no objections to the admissibility of the expert witnesses for appellee. Indeed, it did not object to their testimony at any time until after it was presented to the jury. Instead, appellant seizes on the scientific methodology language referred to in *Daubert* and concludes that the expert evidence here is not supported by proper scientific methodology and is therefore insufficient to support the damages verdict in this case. *Id.* —— U.S. ——, 113 S.Ct. at 2796. We do not believe that an injured seaman under the Jones Act precedents previously mentioned, is now required to produce a favorable epidemiological study, which is apparently the preferred scientific method for proof of toxic tort damage, in order to prove causation. *Brock v. Merrill Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.1989). We find other relevant distinctions between this case, *Daubert,* and other Benedictin cases, which we will discuss later after a general review of the expert evidence.

Appellants are even more expansive than the federal standards of *Daubert* in their position. They assert that the expert evidence in this case would be insufficient to sustain the verdict even under Texas negligence and causation standards. They refer us to a recent sister appellate court's opinion as supportive of their position. *Merrell Dow Pharmaceuticals Inc. v. Havner,* 1994 WL 86436 (Tex.App.—Corpus Christi 1994, no writ) (opinion not yet released for publication in the permanent law reports). In *Havner,* a panel of the appellate court reversed a judgment based on a jury verdict in a toxic tort negligence case, also involving Benedictin. It applied what it perceived to be the federal *Daubert* standard to Texas law. Indeed, it went beyond *Daubert*—even beyond appellant's position—and ruled that causation conclusions expressed in terms of reasonable medical probability by a qualified expert witness, amount to no evidence, not even a scintilla, as a matter of law. *Id.* Even appellants here concede by alleging only insufficiency grounds "that there is conflicting evidence on the issue." *Raw Hide, supra.* *Havner's* conclusion totally ignores the expert's training, experience, knowledge, even treatment, test-tube analysis and chemical composition analysis. Needless to say, we disagree with that conclusion by a panel of our sister court. Our view of long standing Texas precedents reveals that experts qualified on the basis of their experience, training, treatment, and knowledge, who testify in terms of reasonable medical probability not only constitute some evidence of causation, but are frequently determinative of the issue.

*Lenger v. Physician's Gen. Hospital,* 455 S.W.2d 703 (Tex.1970).

If *Havner* becomes binding precedent in its present form, we presume that our instructions to the jury based on TEX.R.CIV.P. 226a will have to be eliminated or certainly modified. No longer could we with judicial integrity instruct jurors that they "are the sole judges of the credibility of the witnesses and the weight to be given to their testimony."

In any event, Texas law is generally consistent with federal law regarding expert testimony on causation. To recover damages, a plaintiff must prove by competent evidence a causal nexus between the event sued upon and the injuries alleged. *See Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 732 (Tex.1984). "Causal connection ... must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture." *Insurance Co. of North America v. Myers,* 411 S.W.2d 710, 713 (Tex.1966); *see also Gideon v. Johns–Manville Sales Corp.,* 761 F.2d 1129, 1137 (5th Cir.1985). Whether the evidence rests in reasonable probabilities depends upon the substance of the expert's testimony. *Myers,* 411 S.W.2d at 713. "Expert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanation, it becomes more likely than not that the condition did result from the event." *Lenger,* 455 S.W.2d at 707. Here, all of appellee's expert witnesses testified that appellee's severe and lengthy exposure to Diazinon caused his prolonged neural damage. They expressed their opinion on bases, ranging from reasonable medical probability to without a doubt.

As supportive of its methodology position, appellant directs us to three fifth circuit cases. *Brock v. Merrill Dow Pharmaceuticals, Inc.,* 874 F.2d 307 (5th Cir.1989) (Brock I); *Brock v. Merrill Dow Pharmaceuticals, Inc.,* 884 F.2d 166 (5th Cir.1989) (Brock II);

*Christophersen v. Allied Signal Corp.,* 914 F.2d 66 (5th Cir.), *reh. en banc,* 939 F.2d 1106 (5th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992). The Fifth Circuit held that courts should "critically evaluate the reasoning process by which the experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them." *Brock I,* 874 F.2d at 310. In *Brock,* the Fifth Circuit analyzed the types of evidence regarding causation typically offered in a toxic tort case. The court noted that the most useful and conclusive type of evidence is the epidemiological study which attempts "to define a relationship between a disease and a factor suspected of causing it. . . ." *Id.* at 311. Regarding such general population studies, the court added:

> To define that relationship [between a disease and its alleged cause], the epidemiologist examines the general population, comparing the incidence of the disease among those people exposed to the factor in question to those not exposed. The epidemiologist then uses statistical methods and reasoning to allow her to draw a biological inference between the factor being studied and the disease's etiology.

*Id.* As the court also mentioned, epidemiological studies do not necessarily exclude other possible causes for the same disease. *Id.* Two epidemiological studies of the effects of the drug Benedictin were admitted into evidence in *Brock. See id.* at 312. One study did not support a statistically significant connection between Benedictin and birth defects. *Id.* The other study found a greater risk of birth defects, but that the risk was also not statistically significant. *Id.* Because the plaintiffs did not present any statistically significant epidemiological proof that the drug causes birth defects, the court held that the evidence was insufficient to enable a trier of fact to make a reasonable inference as to causation.[3] *See id.* at 315; *Brock II,* 884 F.2d at 167.

**3.** In *Brock I,* the Fifth Circuit found "the lack of conclusive epidemiological proof to be fatal to the Brock's case." 874 F.2d at 313. On rehearing, the court changed this sentence and others indicating a requirement of conclusive epidemio-

logical studies to a requirement of "statistically significant epidemiological proof." *Brock II,* 884 F.2d at 167. But the realistic conclusion in the opinion puts great weight on epidemiological studies as the premiere type of proof to establish

In a later case, the Fifth Circuit again addressed questions about an expert's testimony regarding causation in a toxic tort case. *See Christophersen, supra.* In *Christophersen,* the trial court had excluded an expert's opinion that exposure to certain chemicals at a plant caused cancer. *Id.* at 1109. In determining whether the trial court erred in excluding this testimony, the Fifth Circuit set forth three threshold requirements for the admissibility of expert testimony: (1) whether the witness is qualified to express an expert opinion on the topic at issue, (2) whether the data upon which the expert relies are of the same type other experts in the field reasonably rely upon in forming their opinions, and (3) whether in reaching his conclusion, the expert used a "well-founded methodology or mode of reasoning, one 'sufficiently established to have gained general acceptance in the particular field in which it belongs'." *Id.* at 1110–11. Even if the testimony meets these three requirements, it may still be excluded if the testimony's "potential for unfair prejudice substantially outweighs its probative value." *Id.* at 1110; *see also* FED.R.EVID. 403.

The trial court in *Christophersen* had criticized the expert's testimony on the grounds that the facts and data underlying the opinion were inaccurate and incomplete and that the expert offered no scientific methodology to support his conclusion. *Id.* at 1113–15. In reviewing these criticisms, the Fifth Circuit first found that the expert over-estimated the duration of the decedent's exposure to certain chemicals and had no accurate data regarding the chemical composition of the fumes in the plant where the alleged exposure occurred. *Id.* at 1113. Thus, the court agreed that the trial court could properly reject expert opinions founded on critical facts that are untrustworthy. *Id.* at 1114. The expert in question also testified that the kind of evidence most often used to establish causation are epidemiological studies, animal testing, and *in vitro* testing. *Id.* at 1115. Despite his testimony regarding the main

methodologies, this expert offered no methodology to support his conclusion that the types of chemicals used at the plant were associated with the form of cancer found in the decedent. *Id.* Because the expert offered no well-founded methodology to support his opinion regarding causation, the Fifth Circuit concluded that the expert's opinion was no more than a scientific hunch and was inadequate to support a judgment in favor of the plaintiff. *Id.*

*Brock* and *Christophersen* both emphasize the importance of epidemiological studies to establish causation in federal toxic tort cases. *See Brock I,* 874 F.2d at 313; *Christophersen,* 939 F.2d at 1115. Furthermore, both cases take the position that expert opinions unsupported by some type of well-founded scientific reasoning or methodology constitute mere speculation, insufficient to support a judgment. *See Brock I,* 874 F.2d at 315; *Christophersen,* 939 F.2d at 1115. *Daubert* has now closed the field and given federal trial courts some "gatekeeping" responsibilities in determining the admissibility of expert testimony. In dicta it gives support to some type of scientific methodology approach to evaluate the reliability of scientific evidence. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2797.

■ Appellant contends the conclusions of appellee's experts amounted to speculation because they were unsupported by scientific epidemiological studies or other unnamed, unproved well-founded methodologies establishing a link between Diazinon exposure and delayed permanent neurotoxic damage; that *Daubert* now requires a well-founded scientific methodology in order to establish causation in all tort cases involving poisonous chemicals. Texas courts, however, with the exception of the *Havner* case by the Corpus Christi court, have not adopted this approach.

Turning to the evidence in this case, we find that appellee offered the testimony of several expert witnesses, four of whom were

---

causation in toxic tort cases. For an opposing and somewhat critical view of *Brock,* as well as an excellent review of scientific methodologies including epidemiological studies and their weaknesses, *see DeLuca v. Merrell Dow Pharma-*

*ceuticals, Inc.,* 911 F.2d 941, 946–52 (3rd Cir. 1990). Also see K.J. Rothman, "Modern Epidemiology" (1986), which places less weight on significance testing such as epidemiological studies.

medical doctors who examined and treated him. One non-treating expert was Dr. Edward Ezrailson, who was qualified without objection as an expert witness. Dr. Ezrailson has a Ph.D. in biochemistry, had studied the subject of toxicology, how poison effects the health of human beings. He had done advanced studies in pharmacology, completed his first postdoctoral fellowship at Baylor College of Medicine in its Pharmacology Department. Later, he completed a second postdoctoral study at Baylor in the subjects of molecular pharmacology and cellobiose physics; the latter, involving the study of how nerve cells communicate and electrical impulses are sent from cell to cell. He joined the faculty at Baylor, was awarded and completed a study grant for the Environmental Protection Agency on the toxic effect of organophosphates on lab animals.

He testified that he was familiar with the chemical makeup and toxicology of Diazinon and that it had known poisonous properties. He discussed his extensive review of the available scientific literature on the subject of organophosphates.[4] He testified in detail about how organophosphates like Diazinon attack the nervous system and can be deadly. He testified in great detail about how human overexposure to organophosphates results in neurotoxic damage. He explained how the inhalation of an organophosphate causes the inactivation of acetylcholinesterase, an enzyme necessary for the transmission of nerve signals from one nerve pathway to another. He explained that such inhalation can temporarily destroy the enzyme, and thereby cause a continuous disruptive nerve signal. This causes such symptoms as muscle cramps and chest pains, among others. He also stated that such inhalation can also cause the enzyme to become neurotoxic with the ultimate result that it kills nerve cells, and that it can have a delayed neurotoxic effect that can go for years and years, and as in this case, even a lifetime.

More specifically, Dr. Ezrailson reviewed the ship logs, medical records, and deposition

4. Dr. Ezrailson's testimony referenced the following articles: (1) "Sequelae of Acute Organophosphate Poisoning" by Dr. I.R. Tabershaw, which concluded that exposure to certain organophosphates can result in delayed symptoms (did not list diazinon as one of the organophosphates studied); (2) "Delayed Neurotoxicity and Other Consequences of Organophosphates Esterase," by Ronald Baron, not admitted into evidence, noting that certain organophosphates have been shown to cause a delayed neurotoxic effect, but that this neuropathy is always proceeded by a period of approximately 7–14 days (article did not mention diazinon); (3) "Correlations Between Recovery Rate of Neurotoxic Esterases and Sensitivity of the Organic and Phosphate Induced Delayed Neurotoxicity," by Carrington, not admitted into evidence but does not even mention diazinon; (4) "Long Term Effects of the Organophosphate Sarin on EEG in Monkeys and Humans," by Duffey and Burchfiel, not admitted into evidence, stating that many, but not all organophosphates have been found to cause delayed neurotoxicity; (5) two articles by Finklestein entitled, "Brain Acetylcholinesterase After Acute Parathion Poisoning," and "CNS Involvement in Acute Organophosphate Poisoning: Specific Pattern of Toxicity, Clinical Correlates, and Antidotal Treatment," both of which concerned parathion and neither were admitted into evidence but does not consider or discuss diazinon; (6) "Anxiety Associated with Exposure to Organophosphate Compounds," by Levin, not admitted into evidence, which concerned effects on farm workers who received chronic exposure to organophosphates and found no relationship between exposure and depression; (7) "Behavioral Effects of Organophosphate Pesticides in Men" by Levin and Midski, not admitted into evidence; (8) "Spatial Memory Impairment and Central Muscarinic Receptor Loss Following Prolonged Treatment with Organophosphate" by McDonald, not admitted into evidence, which studied the effects following daily exposure to two insecticides, not including diazinon, over a fourteen-day period; (9) "Delayed Neurotoxic Effects of Some Organophosphorous Compounds," by Johnson, not admitted into evidence, delayed neurotoxicity manifests itself 7–14 days after exposure but not all organophosphates induce delayed neurotoxicity; (10) "Evidence of Necrosis in Human Intercostal Muscles," by Wecker, Mrak, and Dettbarn, not admitted to evidence, which concerned a study of a man who received a fatal dose of malathion and diazinon but did not link diazinon to delayed neurotoxicity; (11) "Fatal Diazinon Poisoning in Man," by Hendricks, not admitted into evidence, which concerned a person who committed suicide by ingesting diazinon but did not link diazinon with delayed neurotoxicity; (12) "Central Actions of Organophosphate Agents," by Karczmar, not admitted into evidence, which studied the mental effects of exposure to certain organophosphates, not including diazinon; (13) "Organophosphate Polyneuropathy," by Lotty, not admitted into evidence, that concluded symptoms of organophosphate induced delayed neurotoxicity usually begin one to three weeks after acute exposure and lists six chemicals that cause delayed neurotoxicity but does not list diazinon as one of those included in the study.

testimony in this case concerning appellee's Diazinon exposure. He also reviewed the Material Safety Data Sheet required by federal law from the manufacturers of Diazinon to alert users to the dangers of Diazinon exposure; from these, he concluded that Richard Ellis had suffered an exposure to Diazinon in an enclosed space that was 100 to 200 times that considered safe for humans. He reviewed the symptoms which the Material Safety Data Sheet listed for overexposure to Diazinon; these were headaches, blurred vision, nervousness, weakness, nausea, cramps, respiratory difficulty, muscle twitches, convulsions, and loss of reflexes. Most of these symptoms and others were initially or later exhibited by Ellis. He also reviewed the laboratory findings after the exposure which reflected below normal levels of cholinesterase in appellee's blood cells and blood plasma. These were further confirmation of his diagnosis of a severe exposure.

Based on his education, training, experience, extensive review of scientific literature, and the detailed analysis of the medical records and facts of this case, Dr. Ezrailson concluded that in reasonable probability Richard Ellis had suffered permanent injury to his nervous system caused by his severe and prolonged exposure to Diazinon.

Another expert witness for appellee was Dr. Alfred R. Johnson, a Doctor of Osteopathy, who works at the Environmental Health Center of Dallas, Inc. This center provides health care to the public, emphasizing the health effect and treatment of environmental exposure. Dr. Johnson testified that he has treated appellee and other patients suffering from exposure to Diazinon or other similar chemicals. Dr. Johnson's diagnosis for Richard Ellis was "organophosphate toxic exposure with relating damage in the form of delayed toxicity reaction and permanent nerve damage." Dr. Johnson testified that exposure to Diazinon can cause delayed central nervous system symptoms, and that the length of time before such symptoms appear, can vary with the individual from a couple of weeks to a few months. Dr. Johnson testified that, in his opinion, based upon reasonable medical probability, appellee's current problems were caused by the August 1982 exposure to Diazinon. Dr. Johnson based this diagnosis on his examination of appellee and on a review of appellee's medical records showing a prolonged exposure to Diazinon and depressed levels of cholinesterase. Dr. Johnson testified that he was familiar with the literature regarding organophosphate poisoning, but he could not recall any studies dealing only with Diazinon and the long-term effects of Diazinon exposure on humans.

Appellee also called Dr. Francis J. Waickman as an expert witness. Dr. Waickman is board certified in clinical immunology, allergy, environmental medicine, utilization review and quality assurance, and pediatrics. This latter, his speciality, which initially prompted him to seek further expertise in the other fields. He also has taken postgraduate courses in many areas, including toxicology, allergy, and clinical immunology. He also evaluates and treats people who have chemical sensitivities and who have been poisoned by exposure to organophosphate pesticides. He testified that from his examination of Richard Ellis, he found central nervous system problems, including loss of memory, slow verbal responses, and diminished reasoning and recall, less than expected from a man of Ellis' age and education. Waickman also listed symptoms of muscle weakness and emotional instability. Dr. Waickman discussed extensively the long term effects of delayed neurotoxicity which can be caused by organophosphates like Diazinon. He described how such substances can cause permanent injury to the axon of the nerve, which can ultimately cause the nerve cell body to die.

Dr. Waickman testified specifically about causation. He stated that there is "no question" that Richard Ellis' central nervous system problems that he observed were caused by his exposure to Diazinon. He also said there is "no doubt" about the causal connection between the Diazinon exposure and his problems. Further, he discussed Ellis' case with the top consultant in the Environmental Protection Agency, who agreed that Ellis' health problems were "unquestionably" caused by the Diazinon poisoning. He also stated Richard Ellis' central nervous system damage was permanent.

Finally, appellee offered the testimony of Dr. Richard Austin, a clinical psychologist who has had experience treating people who have been poisoned by various chemicals. Dr. Austin personally examined and evaluated appellee, gave him a battery of psychological tests, reviewed the medical records of doctors who had treated appellee, elicited historical information from appellee's family and friends, and reviewed scientific literature regarding organophosphate poisoning. Dr. Austin concluded that appellee suffered nervous system damage resulting in emotional problems caused by the Diazinon poisoning in 1982. Dr. Austin was familiar with a study, admitted into evidence, that was performed on behalf of the EPA by Drs. Savage, Keefe, and others, entitled "Chronic Neurological Sequelae of Acute Organophosphate Pesticide Poisoning."[5] This study involved testing of individuals chronically exposed to a variety of organophosphate pesticides, not including Diazinon. Dr. Austin agreed that appellee suffers from many of the same impairments and exhibits similar test results to those discussed in the literature resulting from organophosphate poisoning. Dr. Austin testified that there are authoritative studies showing that organophosphate poisoning can cause delayed neurotoxic effects.

Appellee also presented testimony from Dr. James Carter, his family doctor from his hometown. Dr. Carter testified that he saw and treated Ellis at his clinic in 1982 after the Diazinon exposure. His symptoms were dizziness, blurred vision, headaches, numbness in his arms and legs and chest pain. In the next two years, appellee was also treated for stomach, cramps, blurred vision, muscle cramps, weakness, fatigue and anxiety. In 1986, he was having episodes of passing out and blackout spells. Dr. Carter also testified that Ellis, prior to the exposure, was in good health and had no psychological or mental problems until after the exposure to Diazinon.

Appellant presented the testimony of three doctors, Dr. Velma Campbell, Dr. Eric Comstock, and Dr. Francisco Perez. Dr. Campbell treated appellee in the emergency room at the New Orleans General Hospital. Campbell testified that some pesticides can cause delayed neurological symptoms, but that to her knowledge, Diazinon is not one of these.

Dr. Perez is a clinical psychologist specializing in neuropsychology and behavioral medicine. Perez did not examine appellant, but reviewed his medical and psychological records and reviewed the literature regarding organophosphates. Perez testified that in his opinion a worsening of a patient's psychological condition is not a typical symptom caused by exposure to Diazinon. Perez concluded, based on his review of the records and literature, that appellant's symptoms are most likely unrelated to the Diazinon exposure.

Dr. Eric Comstock, a medical toxicologist, although now primarily a forensic consulting expert, testified that he had experience in the past treating persons exposed to toxic substances, 80–100 of which involved Diazinon. Comstock also reviewed appellant's medical records and the literature about organophosphates, but never examined appellant. Comstock agreed that appellant initially exhibited mild acute effects from the exposure, including eye irritation, slight weakness, diarrhea, headaches, and vomiting, but based on his experience and review of the records and literature, Comstock stated that in his opinion appellant has suffered no delayed effects related to the Diazinon exposure.

Comstock testified, without specific evidentiary proof, that Diazinon is an "unrestricted use" pesticide, which means that it does not cause, or has not been shown to cause, severe, impairing long-term effects. This was contrary to evidence from Dr. Ezrailson that

---

**5.** The two studies admitted into evidence include: (1) "Chronic Neurological Sequelae of Acute Organophosphate Pesticide Poisoning," by Savage, Keefe, Mounce, Heaton, Lewis and Burcar, offered into evidence by appellee which evaluated the latent neurological effects of organophosphate poisoning on 100 patients, none of which had been exposed to diazinon; and (2) "Pesti-cides & brain-function changes in a controlled environment" by Rea, Butler, Laseter, and De-Leon, offered into evidence by appellant, which studied whether environmentally controlled conditions improve the symptoms of patients who have been exposed to other organophosphate pesticides, other than diazinon.

Diazinon was not unrestricted and was specifically precluded from use on golf courses. Comstock noted that his personal experience treating persons exposed to Diazinon has not indicated that Diazinon causes delayed neurotoxicity. Furthermore, Comstock opined that Diazinon has been widely used by the public for many years and that, if it caused delayed neurotoxicity, this would have been identified. Finally, Comstock testified that none of the literature supports the conclusion that Diazinon causes delayed neurotoxicity, and that there is literature concluding Diazinon does not cause delayed neurotoxicity.[6] However, this was not introduced into evidence and no basis for the unknown authority's conclusion as related by Comstock was given. The record reflects that Dr. Comstock's credibility was challenged by vigorous cross examination which referred to criticism of his testimony by the judge in a previous toxic tort court case.

After reviewing all of the expert testimony and other evidence concerning the circumstances of the appellee's exposure to an admittedly dangerous chemical and the state of his health before, and after, the exposure, we find that the evidence more than satisfies the Jones Act standard for negligence and causation. Or stated more precisely, we find that there was sufficient evidence before the jury to justify their finding that the employer's admitted negligence in exposing appellee to extreme levels of a dangerous chemical pesticide did play a part in producing the injury for which the damages were sought and awarded. *Rogers v. Missouri Pacific R. Co.*, *supra.* In addition to finding that the evidence satisfies this so-called "featherweight" burden of negligence and causation in Jones Act cases set out in the previously cited cases, we also find that the evidence was sufficient under the greater standard of proof for causation under Texas evidentiary rules.

Juries are entitled to determine causation based on qualified expert testimony based on reasonable medical probability. Indeed, they can rely on expert testimony that the event is a "possible cause" of the injury or condition

when, in the absence of other reasonable causal explanation, it becomes "more likely than not" that the condition did result from the event. *Lenger*, 455 S.W.2d at 707. Here, the expert evidence was clearly based on reasonable medical probability and stronger in some instances. But even more telling, was the circumstantial evidence presented which would fulfill *Lenger's* "possible" cause standard, because there was an absence of other reasonable causal explanation of the change in this seaman's good health before his exposure to Diazinon to his subsequent, continuing symptoms which were traced, specifically and analogously, to organophosphate poisoning. This "possible cause" standard of *Lenger* when applied to the facts of this case is not too far removed from the "featherweight" standard of the Jones Act previously enumerated.

We also disagree with appellant's implied suggestion that we should apply a scientific, rather than a legal standard of evidence to review sufficiency of the evidence as to causation in a Jones Act, or a Texas negligence case. In essence, they are suggesting that we should apply a version of "beyond a reasonable doubt" rather than a Jones Act, or preponderance of the evidence standard. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 797 (1951). We acknowledge the "scientific methodology" federal approach mentioned as dicta under the "general observations" section of *Daubert*, and relied on by appellants. *Daubert*, —— U.S. at —— ——, 113 S.Ct. at 2796–98. Whatever final form and application may be given this approach by the federal courts, we find nothing to indicate that it even in its initial, undefined form, is intended to completely erase the liberal standard of evidence for negligence and causation in cases involving injuries to seamen under the Jones Act.

Should we adopt such a strict scientific methodology standard in toxic tort cases, there would be no real need for juries, or judges for that matter, to determine the weight and credibility of expert evidence. A computer properly programmed with the

---

6. Comstock specifically noted that the article entitled "Poisoning Due to Organophosphate Insecticides," (author unknown) concluded that Diazinon, as well as certain other insecticides, did not produce neuropathy.

current preferred scientific methodology would be sufficient. The expert evidence and facts of the case could be entered, and the computer, with the speed of electrical impulses, could compare the evidence to its methodology litmus and respond: "accepted or rejected, according to presently preferred methodology." The speed and efficiency of applying such a standard is obvious. It eliminates that unpredictable element, the human juror; with all of his or her attendant weaknesses, such as common sense and human experience. A strict scientific standard is attractive to us judges because it has an aura of perceived certainty around it. And we all desire certainty. There is, however, no certainty in science, nor in law, but the legal standard for expert evidence has generally served us well notwithstanding its imperfections. We are constantly fine tuning it, but without removing it from its foundation. It is designed to aid the jury, not replace it. Nor should it be removed from its moorings, the human elements: the advocates to present it, the judges to regulate it, and the jurors to be guided by it, in order to decide the issue.

Aside from the scientific evidentiary issues, we also note the significant factual distinctions between this case and the *Brock* and *Daubert* cases. The chemical here, unlike Benedictin, was not designed to be orally ingested by humans, nor for that matter, by any other living creatures, except insects. Diazinon is an organophosphate specifically formulated to kill insects by destroying their nervous systems. It is known to be toxic to the nervous systems of humans if ingested, inhaled or improperly touched. And it can be fatal if ingested by humans. Also, in contrast to the Benedictin cases, the extent of the overexposure to the toxic chemical by appellee is clear-cut. The symptoms he experienced were immediate and continuing, according to the evidence. They were the type of symptoms known to be caused by overexposure to Diazinon. Only their duration and permanency were contested. In the Benedictin cases, the alleged exposure was to an unborn fetus in the early stages of its development. The comparative difficulty in determining even the extent of the chemical's exposure to the embryonic fetus, via the mother's ingestion of a pill, is obvious. Even more difficult if not impossible, is the retroactive determination of the condition of the fetus before and after the exposure. Added to this is the effect of other unknown factors on the fetus. By way of further evidentiary contrast, here, the health of appellee before the severe exposure was normal. The exposure was direct, not indirect, and the extent of the exposure was specifically shown to be 100 to 200 times that considered to be safe for humans. Indeed, even after several days and three cleanups, a biochemist brought on board by appellant found the chemical still present in amounts that were in one instance, 14 times, and in another, 36 times, stronger than the maximum safe amounts recommended by the manufacturer. Appellee's health after the exposure was also known. Evidence showed that he had initial and continuing symptoms that included eye problems, memory loss, blackouts, chest pains, severe headaches, loss of muscular control, nausea, fatigue, and numbness in arms and legs. He also experienced severe psychological and other mental problems, along with thoughts of suicide. We find these evidentiary distinctions significant and the expert witnesses were entitled to consider them along with their other knowledge and expertise in making their conclusion that a *causal nexus* exists between the exposure to Diazinon and appellee's injury. And, in turn, the jury was entitled to weigh and evaluate them along with all the expert evidence. Therefore, contrary to appellant's contentions, we do not find the *Brock* and *Daubert* cases to be comparable adverse precedents determinative of this case.

If we accept appellant's interpretation, *Daubert* would, by dicta, impliedly overrule a long line of federal precedents, including *Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959). *Sentilles* was a Jones Act case in which the seaman alleged that his previously latent tubercular condition was aggravated and activated by a fall he sustained on board the ship. The best expert medical evidence was that the activation of the latent tuberculosis might be a consequence of the accident, or it "probably aggravated his condition,"

although the expert would not say definitely. "We don't ever select one item and say that is the cause of any particular aggravation." *Id.* 361 U.S. at 109, 80 S.Ct. at 175. The U.S. Supreme Court reversed, holding that the evidence sustained the jury's conclusion that the accident caused the aggravation of the seaman's latent tuberculosis. It stated that:

> "The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause ... The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take *all the circumstances*, including the medical testimony into consideration." *Id.* 361 U.S. at 109–10, 80 S.Ct. at 175. (*emphasis added*).

No comparative battle of scientific methodologies was required in *Sentilles* and other Jones Act cases. Nor do we find it to be required here. The jury in our case was instructed in accordance with TEX.R.CIV.P. 226a that they were the sole judges of the credibility of the witnesses and the weight to be given to their testimony. They were presented with qualified expert witnesses who were not challenged by the appellants as to the admissibility or credibility of their methodology. After considering the conflicting testimony of all the experts, and other evidence, they judged it's credibility and weight. Based on their evaluations, they answered "yes" to question no. 1 which inquired as to whether appellant's negligence played even the slightest part in producing injury or illness to Richard Ellis. We cannot now, as appellant's position would suggest, sit as a thirteenth super-juror and reach outside the evidence to apply some scientific methodology standard to re-weigh the evidence and its credibility over what the jury has already found. We simply do not have that power as an appellate court. *Benoit, supra,* at 796. Instead, we conclude, after reviewing the evidence through the lens of the Jones Act standard, that the jury was entitled to weigh the conflicting expert testimony based on reasonable probability along with the circumstantial evidence, and find that the extreme exposure to a toxic chemical, Diazinon, caused appellee's injury. We overrule appellant's first point of error and find that the evidence was sufficient.

■ In points of error two, three and four, appellant challenge the punitive damages of $1,000,000 awarded to appellee by the jury as a result of their gross negligence finding against appellant in response to question no. 7. Specifically, in point of error four, appellants assert that punitive damages cannot be recovered under either the Jones Act or general maritime law. At the time this cause was argued, it was clear that exemplary damages were not available under the Jones Act. *Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1347 (9th Cir.1987); *see Kopczyknski v. The Jacqueline,* 742 F.2d 555, 560–61 (9th Cir. 1984), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985). However, the recoverability of such damages under general maritime law was allowed in *Complaint of Merry Shipping Inc.,* 650 F.2d 622 (5th Cir. 1981). Following the submission of this cause, the Texas Supreme Court has vindicated appellant's position in *Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294 (Tex. 1993). *Penrod* held that punitive damages were "non-pecuniary" and therefore not recoverable by Jones Act seaman in general maritime unseaworthiness claims. It grounded its ruling on the rationale expressed by the U.S. Supreme Court in *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *Penrod,* 868 S.W.2d at 296–297. We therefore sustain appellant's point of error four and reverse the judgment for punitive damages awarded to appellee for gross negligence. Points of error two and three are necessarily mooted by this ruling.

In points of error five and six, appellants contend the trial court erred in excluding certain evidence of appellee's alleged alcohol abuse. Appellant cites to several references in the record where the trial court allegedly sustained appellee's objection to the testimony or records of Drs. Perez, Carter, and Austin regarding appellee's alleged use of alcohol.

■ The record shows that the trial court had sustained appellee's motion in limine regarding evidence of appellee's alleged use of alcohol. When appellant questioned appellee's witness, Dr. James Carter, about appellee's use of alcohol, the testimony occurred outside the presence of the jury. The record shows no offer to admit this evidence by appellant and no ruling by the trial court. By failing to offer this testimony and obtain a ruling regarding its admission, appellant cannot complain about the exclusion of this evidence on appeal. *Lakeway Land Co. v. Kizer,* 796 S.W.2d 820, 827 (Tex.App.—Austin 1990, writ denied).

■ Before appellant offered the testimony of Dr. Francisco Perez, the trial court stated that it would allow testimony regarding appellee's use of alcohol only insofar as it could be a contributing cause of appellee's symptoms. The trial court refused to allow testimony regarding alleged alcohol use or any prior DWI arrest, based on its prejudicial effect. Dr. Perez, was, however, allowed to testify that he noticed handwritten references to alcohol use in Dr. Richard Austin's notes, and in his opinion, Dr. Austin should have explored this as a possible cause of appellee's symptoms. Dr. Perez noted that assessment of potential alcohol abuse is essential from a psychological standpoint, where there is a question of organic impairment, because excessive prolonged alcohol abuse can produce organic changes.

We find no error in the trial court's exclusion of testimony regarding a past DWI arrest on the ground that the probative value of this testimony was outweighed by its prejudicial effect. *See* Tex.R.Civ.Evid. 403. The trial court did allow some testimony about appellee's use of alcohol and the possible relationship between excessive alcohol use and symptoms such as those alleged by appellee. Appellant has not established that any error on the part of the trial court in excluding testimony by Dr. Perez regarding alcohol use was "calculated to cause and did cause rendition of an improper judgment." Tex.R.App.P. 81(b)(1).

Appellant also contends the trial court erred in excluding Defendant's exhibit 1A, which contained the handwritten notes previously mentioned concerning alcohol use from the files of Dr. Austin. These were some third party's notes, not Dr. Austin's. During cross-examination of Dr. Austin, appellant attempted to offer the entire file of Dr. Austin including these notes. There was a discussion out of the presence of the jury regarding this exhibit, but the discussion is not contained in the record. In connection with this exhibit, appellant filed a motion in this court attaching an affidavit of the court reporter in the trial of this case and asked to supplement the record with a "new" page 1229 included in the statement of facts. The affidavit states that, at the request of appellant's counsel, the court reporter reviewed her notes and prepared a corrected version of page 1229 reflecting appellant's offer of exhibit 1A, appellee's objection, and the trial court's ruling, sustaining the objection. Appellant later filed a reply brief referencing this affidavit. Appellee has filed a motion to strike this affidavit and the reply brief. We took this motion with the case.

Appellee subsequently filed a supplemental motion to strike this affidavit and attached a new affidavit by the same court reporter and a copy of her notes taken during trial. In the new affidavit, the court reporter states that the original affidavit submitted by appellant, was in error to the extent it asserts that the record reflects an offer of exhibit 1A, an objection, and a ruling by the trial court. The reporter now states that a review of her handwritten notes, stenographic notes, the audio records of the trial, and her memory indicate that exhibit 1A was not offered into evidence and there was no subsequent objection and ruling by the trial court. The reporter confirms that the amended page 1229 included in the statement of facts is accurate in that it reflects no offer of the exhibit or ruling by the trial court. Attached to this new affidavit is a copy of the reporter's handwritten notes indicating no offer or ruling on exhibit 1A. Based on our review of the record and the subsequent affidavits and supporting notes, we grant appellee's motion to strike the initial affidavit.

■ Thus, the record, including the amended page from the statement of facts, indicates that after the discussion off the

record, appellee's attorney voiced his willingness to stipulate that everything, except exhibit 1A, were business records of Dr. Austin. Exhibit 1A contained the handwritten third-party notes. Appellee apparently agreed to the admission of exhibit one without these handwritten notes; however, appellant obtained no ruling on the admission of these exhibits and made no bill of exceptions. Because appellant failed to obtain a ruling regarding this evidence, appellant has not preserved this complaint for appellate review. *Industrial Disposal Supply Co., Inc. v. Perryman Bros. Trash Serv., Inc.,* 664 S.W.2d 756, 762 (Tex.App.—San Antonio 1983, writ ref'd n.r.e). We overrule points of error five and six.

In points of error seven through ten, appellant challenges the submission of jury questions regarding maintenance and cure and the award of exemplary damages on the issue of maintenance and cure. Appellant claims no evidence supported the submission of issues on maintenance and cure and no evidence supported the finding requisite to imposition of exemplary damages that appellant's failure to pay maintenance and cure was willful, arbitrary, and capricious.

 Upon injury, a seaman is entitled to maintenance and cure until the date of maximum possible cure, or the date beyond which further treatment would not improve the condition. *Johnson v. Marlin Drilling Co.,* 893 F.2d 77, 79 (5th Cir.1990). Punitive damages are available if there is proof the shipowner's failure to pay maintenance and cure was willful, arbitrary, and capricious. *Breese v. AWI, Inc.,* 823 F.2d 100, 103 (5th Cir.1987).

 In jury question no. 10, the jury found that appellee never reached maximum medical cure. Under jury question no. 12, the jury found that appellant acted willfully, arbitrarily, and capriciously in failing to pay maintenance and cure to appellee. Based on

this affirmative finding, the jury awarded appellee $1 million in exemplary damages in jury question no. 13. Appellant argues that there was no evidence appellee demanded maintenance and cure, that appellant ever refused to pay maintenance and cure, or that appellant acted arbitrarily and capriciously in failing to pay these amounts. In *Harrell v. Dixon Bay Transp. Co.,* 718 F.2d 123, 129–30 (5th Cir.1983), the court upheld a lower court's finding of legally insufficient evidence of an arbitrary and capricious refusal to pay maintenance and cure where the shipowner relied on the advice and opinions of treating physicians in stopping payments, and where the seaman did not inform the shipowner of further treatments and a newly discovered condition. In *Neveaux v. Lykes Bros. Steamship Co., Inc.,* 476 F.2d 177, 178–79 (5th Cir.1973), the court found no arbitrary or capricious refusal to pay maintenance and cure where the shipowner delayed payment to investigate a claim from a seaman that included no elaborative details.

Appellee contends that, under *Gaspard v. Taylor Diving & Salvage Co., Inc.,* 649 F.2d 372 (5th Cir.1981), there need not be evidence a seaman demanded payment or presented medical bills to the shipowner to support a finding of arbitrary and capricious refusal to pay maintenance and cure.[7] We find *Gaspard* distinguishable. In *Gaspard,* the seaman had not demanded payments and had presented no medical bills to the shipowner after the seaman left the shipowner's employ. *Id.* at 374. Based on these facts, the trial court found no willful, arbitrary, or capricious failure to pay maintenance and cure. *Id.* The Fifth Circuit first noted:

The duty to provide maintenance and cure embraces not only to obligations to provide a subsistence allowance and to pay for medical expenses actually incurred by the seaman, but to take all reasonable steps to ensure that the seaman, when he is injured

---

7. Appellee also cites *Tullos v. Resource Drilling, Inc.,* 750 F.2d 380 (5th Cir.1985) as supporting his contention that there need not be evidence the seaman notified the shipowner of his claim for maintenance and cure. In *Tullos,* however, the seaman did advise the shipowner of his medical claim, but the diagnoses of the doctors conflicted and the shipowner discontinued payments. *Id.* at 387–88. The court found that the diagnoses of the physicians were not so clear and consistent as to validate removal of a jury issue on arbitrary and capricious denial of maintenance and cure. *Id.* at 388. *Tullos* does not hold that a seaman need not notify the shipowner of his claims.

or becomes ill, receives proper care and treatment.

*Id.* at 375. In reviewing the evidence, the Fifth Circuit found that before the seaman terminated his employment he had suffered symptoms of decompression sickness on a number of occasions, had reported these symptoms to the shipowner, and the shipowner unreasonably denied the seaman treatment in a decompression tank. *Id.* at 376. Thus, the court found that the shipowner did not take reasonable steps to ensure the seaman received proper care and treatment and this failure supported the jury finding. *Id.*

In this case, the evidence does not support the conclusion that appellant arbitrarily and capriciously refused proper treatment to appellee. Such an intentional type of refusal requires as a minimum either a notice or demand communicated to the employer, or specific facts which justify the inference that the employer knew and simply ignored or refused to pay. We find no evidence in this record that appellee notified appellant in any way of claims for payment after he left the ship, or that appellant arbitrarily refused to pay. The first notice was apparently the lawsuit, and standing alone, it cannot be a self-fulfilling notice to the employer. Thus, the trial court erred in submitting question no. 12 because there was no evidence upon which the jury could find appellant arbitrarily and capriciously denied payment of maintenance and cure to appellee. We sustain appellant's points of error eight and nine and reverse only the exemplary damages awarded. Having sustained these points, we need not address points seven, and ten.

In point of error eleven, appellant contends the trial court erred in awarding appellee prejudgment interest because, as a matter of law, appellee is not entitled to prejudgment interest. Because appellant did not request or obtain an apportionment of damages between his claims under the Jones Act and those under general maritime law, appellee asserts that he is not entitled to prejudgment interest. *See Wyatt v. Penrod Drilling Co.,* 735 F.2d 951, 955 (5th Cir.1984).

In examining this point of error, we find that under federal law, prejudgment interest in cases involving claimants under the Jones Act and general maritime law have taken somewhat of a dual pathway. Under general maritime law, the award of prejudgment interest is "well nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G.,* 794 F.2d 1026, 1028 (5th Cir.1986). Similarly, prejudgment interest in a Jones Act claim tried to the court may be allowed at the discretion of the court. *Ceja v. Mike Hooks, Inc.,* 690 F.2d 1191, 1196 (5th Cir.1982). However, federal courts have ruled that prejudgment interest is not available in cases brought under the Jones Act that are tried to a jury. *Simeon v. T. Smith & Son, Inc.,* 852 F.2d 1421, 1435 (5th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Barrios v. Louisiana Construction Materials,* 465 F.2d 1157 (5th Cir.1972); *Sanford Bros. Boats, Inc. v. Vidrine,* 412 F.2d 958, 972–73 (5th Cir.1969); *see also Cano v. Gonzalez Trawlers, Inc.,* 809 S.W.2d 238, 240 (Tex.App.—Corpus Christi 1990, no writ). One stated rationale behind denying prejudgment interest in jury-tried Jones Act cases is apparently grounded in the notion that the jury in awarding damages for the various elements makes some allowance for loss caused by delay. *See Barton v. Zapata Offshore Co.,* 397 F.Supp. 778, 779–780 (E.D.La.1975); *Moore–McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 593–94 (2d Cir.1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962). Another stated reason for this rule is that a large part of the damage award in such cases is attributable to future lost wages and future medical expenses, and prejudgment interest is not necessary under federal law to compensate for losses which have not yet accrued. *Wyatt v. Penrod Drilling Co.,* 735 F.2d 951, 955 n. 3 (5th Cir.1984).

The U.S. Fifth Circuit Court of Appeals has extended its prejudgment interest rationale to encompass cases such as this, where the recovery is sought under both Jones Act negligence and the general maritime doctrine of unseaworthiness, which is tried to a jury. It has ruled that "When a damage award is based on a jury verdict finding both Jones Act negligence and unseaworthiness, without providing 'any basis for determining which

portion of the damage award, if any, is attributable to unseaworthiness rather than Jones Act negligence, it is impermissible to award prejudgment interest.'" *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir. 1989). This was held to be true even though neither party suggested "that the jury be requested to allocate damages between the Jones Act and unseaworthiness claims." *McPhillamy v. Brown & Root, Inc.*, 810 F.2d 529 (5th Cir.1987). *McPhillamy* also holds that unless "there is an evidentiary footing for separating the damages caused by unseaworthiness and Jones Act negligence, the jury cannot be asked to apportion the damages." *Id.* at 532. In that case, there was a single harm from a single cause and the court stated that "even if he [the plaintiff] had asked for apportionment, he would not have been entitled to it." *Id.* The same situation exists in this case.

Appellee counters that his claim is based primarily on general maritime law and, therefore, he is entitled to prejudgment interest. However, that argument is considerably weakened by a review of the issues submitted to the jury and their answers thereto, on which the judgment was based. In question no. 1, the jury was asked whether appellant's negligence played even the slightest part in producing injury or illness to appellee. As previously discussed, this critical issue on causation was phrased in accordance with the Jones Act standard. Even though the jury found unseaworthiness, appellee's causation argument is clearly grounded on the Jones Act standard, and to assert that his claim is based solely on general maritime law is inconsistent with that contention and the wording of that central issue.

■ Appellee alternatively argues that the federal rulings on prejudgment interest in Jones Act cases tried to a jury are inconsistent with Texas law regarding prejudgment interest on damages in personal injury cases. He correctly points out that the assessment of prejudgment interest under Texas law is assigned to the trial judge if it is properly pled. No issue is submitted to the

jury. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). Appellee concludes that this assessment of prejudgment interest by the judge is a procedural matter as opposed to a substantive one and, thus, in a Jones Act case tried to state court, the state procedural law prevails. He analogizes to the converse of federal diversity cases where the federal procedural rules are applied along with state substantive law.[8] However, it is clear that the federal courts regard prejudgment interest in maritime law as a substantive issue and that federal law prevails. *Domangue v. Penrod Drilling Co.*, 748 F.2d 999, 1000 (5th Cir.1984); *Wyatt, supra.*

Appellee also argues that the appellant has waived any apportionment of damages to identify strictly general maritime unseaworthiness damages by failing to object or request such an apportionment. However, in view of the federal decisions in *McPhillamy*, *Colburn*, and *Domangue*, it is clear that there must be an "evidentiary footing" for separating the two types of damages; and, impliedly, it is the plaintiff who must ask for an apportionment. *McPhillamy*, 810 F.2d at 532. Even more damaging to this argument is the conclusion in *McPhillamy* that where there is a single harm from a single cause, no realistic basis exists for apportioning damages; and even if plaintiff in that case had asked for an apportionment, he would not have been entitled to it. Appellee's situation is the same. His damages result from one cause, exposure to a toxic substance.

We acknowledge that if this issue of prejudgment interest were being tried under Texas substantive law, we would reach a different conclusion because, unlike the federal law, Texas law empowers only the trial judge to assess prejudgment interest on past, and with certain statutory limitations, on future damages as well. *Cavnar, supra; C & H Nationwide, Inc. v. Thompson*, 37 Tex. Sup.Ct.J. 1059, 1067, 1994 WL 278167 (June 25, 1994); Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(a) (Vernon Supp.1994). Hence, the federal rationale supporting the denial of

**8.** Under the "reverse Erie" doctrine, federal maritime law preempts state law with respect to substantive, but not procedural matters. *Off-shore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986).

prejudgment interest in Jones Act cases tried to a jury conflicts with the theoretical, and now statutory, basis for allowing prejudgment interest in Texas jurisprudence.

We also are aware that we are not intractably bound to follow pronouncements of the Fifth Circuit on disputed federal law issues. Rather, we are only obligated to follow decisions of the U.S. Supreme Court and the Texas Supreme Court. *Penrod v. Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex. 1993). But we are also aware that *Penrod* was dealing with an issue on which federal courts of appeals were divided. Here, we find no such division of opinion between federal courts with regard to prejudgment interest in Jones Act cases. Thus, we find the weight of the numerous decisions by the fifth circuit court as to this question to be persuasive on this federal issue. Accordingly, we sustain appellants point of error number eleven and reverse the judgment for prejudgment interest awarded to appellee.

■ In point of error twelve, appellant claims there is insufficient evidence to support the awards for past and future lost wages. Regarding future lost wages, appellant contends the jury based its award on the following three erroneous assumptions: (1) that appellee suffered from delayed neurotoxicity; (2) that appellee was entitled to the wages of an able-bodied seaman employed year round; and (3) that appellee's capability to work has been reduced by 90% by his exposure to Diazinon.

Appellee's counsel claims appellee attended Bowling Green University to study engineering and then attended the Merchant Marine Academy in Piney Point, Maryland. Appellee's counsel further asserts that appellee had trained with the Merchant Marine Academy for almost two years and had almost completed his training when the insecticide incident occurred. The record, however, indicates that appellee attended Bowling Green State Vocational School, Paducah Area Vocational School, and Oakridge Associated University. Appellee studied civil technology at Bowling Green and Paducah, and he studied nondestructive testing at Oakridge. It is true that appellee did not complete the courses of study at any of these schools.

Appellee attended the Seafarers International Union school for merchant marines. The evidence indicated that this school is not the same as the Merchant Marine Academy and that the course of study is somewhat different. There is no indication in the record that appellee completed this training.

During the two years appellee sailed before the insecticide incident, appellee worked as a GSU, or general steward utility, which is the lowest level in the steward department of a ship. Appellee also worked as an ordinary seaman, which is the lowest level in the deck department. The level above ordinary seaman is the able-bodied seaman. An ordinary seaman must have six months experience in the deck department and pass a test to become an able-bodied seaman. The evidence showed that, in 1983, the average able-bodied seaman AB could earn a monthly salary of $4,000.00–6,000.00.

Appellee's expert on damages was Dr. Tom Mayor. Assuming that appellee remained in the same position he had at the time of the incident, Dr. Mayor calculated the present value of appellee's future lost wages from 1983 forward at $834,753.00. This total figure includes $701,983.00 for future lost wages from the date of trial and $132,769.00 in lost wages from 1983 to the date of trial. Assuming that appellee had become an able-bodied seaman in 1984, Dr. Mayor calculated appellee's future lost wages to be approximately $2,100,000.00 and appellee's lost wages from 1983 to the date of trial at $360,000.00. The jury awarded appellee $320,000.00 in past lost wages and $1,890,-000.00 in future lost wages. Thus, the jury apparently agreed that appellee would have attained the status of able-bodied seaman.

We find that after considering all the evidence, the jury was entitled to make the inference that because of his condition, appellee was deprived of the opportunity to complete his training and attain the higher employment status. We thus find the evidence sufficient and overrule point of error twelve.

■ In point of error thirteen, appellant claims there is insufficient evidence to support the awards for past and future medical expenses. We have reviewed all of the evi-

dence in regard to past and future medical expenses and find that the evidence is sufficient to support the jury's award for each of these. Appellant does not attack the evidence concerning the award of $38,000 for past medical expenses, or indicate why it is excessive, other than to refer to the lack of causation issue. As to the future medical award of $850,000, there is testimony from Dr. Johnson that the probable cost of future medical treatment would be $600,000. Appellant apparently seeks to discount Dr. Johnson's credibility by referring to the fact that he is a licensed osteopathic physician and "not a medical doctor." Dr. Austin also testified without objection that the cost of future psychological treatment for appellee would probably be $250,000. As we previously stated, the jury is entitled to judge the weight and credibility of the expert witness. We therefore find the evidence is factually sufficient to support the jury award, and overrule point of error thirteen.

 In point of error fourteen, appellant contends there was insufficient evidence supporting the awards for past and future physical pain and mental anguish. The evaluation of these elements does not lend itself to a precise mathematical calculation, and it is peculiarly within the discretion of the jury. We will not substitute our judgment therefor unless there is an affirmative showing of bias or prejudice. *Hancock Fabrics, Inc. v. Martin,* 596 S.W.2d 186, 188 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e). After consideration of all of the evidence as to the severity and permanent nature of appellee's nerve damage, we find the evidence factually sufficient to warrant the jury's award for these elements, and overrule appellant's point of error fourteen.

 In point of error fifteen, appellant contends there was insufficient evidence to support the awards for past and future physical impairment. Again, we have examined all of the evidence in the record and find that there is sufficient evidence to show that appellant has permanent nerve damage and muscle weakness that makes him physically unstable, unable to walk long distances, and generally limits his physical activities. The evidence is ample that this condition is permanent and will therefore extend into the future. We find the evidence factually sufficient to support the jury awards for these elements. We overrule point of error fifteen.

With regard to these last three insufficiency points of error concerning damages, we have reviewed all of the evidence in the record, but we elect not to detail all of the supporting evidence inasmuch as we are affirming and not reversing these awards. This is in accordance with our review obligations on insufficiency points of error. *Pool v. Ford Motor Co.,* 715 S.W.2d at 635; *Ellis County State Bank v. Keever,* 37 TEX.SUP. CT.J. 1117, 1120, 888 S.W.2d 790 (June 25, 1994).

Accordingly, we reverse the judgment insofar as it awards exemplary damages in the amount of $1,000,000.00, each, for gross negligence and for malicious, arbitrary failure to pay maintenance and cure. We also reverse the award for prejudgment interest. We render judgment that appellee take nothing in regard to these three elements. We affirm the remainder of the judgment.

SEARS, CANNON, ELLIS and LEE, JJ., concur.

BROWN, C.J., recused.

BOWERS, J., deceased.

ROBERTSON, Justice, concurring and dissenting.

Maritime Overseas Corporation appeals from a judgment rendered in favor of appellee for more than $12.6 million in damages. Appellant raises fifteen points of error challenging the sufficiency of the evidence supporting the award of damages and challenging the amounts of the awards of actual damages, the awards of punitive damages, and the exclusion of certain evidence.

This case was argued before a panel of this court in June 1992. The panel consisted of Justices Junell, Robertson, and Draughn. On December 31, 1992, a majority opinion was issued, joined in by Justices Junell and Robertson, in which we found insufficient evidence to support the damages award. Justice Draughn dissented without an opin-

ion. Justice Junell, not having sought reelection, retired that day. Subsequently, appellee's motion for rehearing en banc was granted and over fourteen months ago this case was re-argued before the court en banc, Chief Justice Brown not sitting because of his recusal. Since then, Justice Bowers (who was a member of the court on rehearing) has passed away. This case is ripe for resolution.

I concur in three holdings of the majority: (1) that punitive damages are not recoverable in a general maritime case, (2) that there is no evidence that appellant arbitrarily denied maintenance and cure justifying an award of punitive damages, and (3) that prejudgment interest was wrongfully awarded. However, instead of the extended discussion by the majority, I merely note that as a matter of substantive federal law, prejudgment interest is simply not recoverable when a damage award is based on a jury verdict finding both Jones Act negligence and unseaworthiness, without providing any basis for determining which portion of the damage award, if any, is attributable to the unseaworthiness rather than the Jones Act negligence. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 378 (5th Cir.1989). This is true even though neither party suggests "that the jury be requested to allocate damages between the Jones Act and unseaworthiness claims." *McPhillamy v. Brown & Root, Inc.*, 810 F.2d 529 (5th Cir. 1987). Further, *McPhillamy* holds that unless "there is an evidentiary footing for separating the damages caused by unseaworthiness and Jones Act negligence, the jury cannot be asked to apportion the damages." *Id.* at 532. In that case there was a single harm from a single cause and the court stated that "even if he [the plaintiff] had asked for apportionment, he would not have been entitled to it." *Id.* The same facts are present in this case.

I dissent to the holding of the majority opinion that there is sufficient evidence to support the jury's finding that appellee suffered $8,576,000 in actual damages. Finally, I dissent to the summary disposition of appellant's points of error 13, 14 and 15 complaining of the awards for past and future medical expenses, past and future physical pain and mental anguish, and past and future physical impairment.

Appellee was a steward's assistant aboard the S/T OVERSEAS ALASKA. On August 27, 1982, the chief steward sprayed undiluted diazinon in the galley, pantry, and dry storeroom. The next morning, crew members noticed a strong odor of insecticide and the captain ordered cleaning of the sprayed areas. Appellee participated in the clean-up for approximately five hours without any protective gear to prevent inhalation or dermal contact. Subsequently, appellee began complaining of a headache and eye irritation. When the ship reached port in New Orleans two days later, appellee received treatment at the New Orleans General Hospital emergency room.

Testimony indicated that exposure to organophosphates can lower the levels of an enzyme called acetylcholinesterase, also called cholinesterase, which is essential to the normal transmission of messages from one nerve to another. Diazinon is an organophosphate. Cholinesterase levels are measured by testing the red blood cells and the blood serum. Blood tests performed at the emergency room revealed that appellee's level of cholinesterase was depressed. Appellee's red blood cell level of cholinesterase was .40, while the average range for men of appellee's age is .44 to 1.09. Appellee's serum level of cholinesterase was .53 or .54, while the average range is 1.90 to 3.80. The examining physician, Dr. Velma Campbell, concluded that appellee suffered organophosphate exposure but determined that this exposure was not serious enough to hospitalize appellee or to administer antidote medications. Appellee received medication for eye irritation and was advised to return for a follow-up visit. Appellee returned to work and served as a crew member for appellant for the rest of that year.

In June 1983, appellee filed suit against appellant under 46 U.S.C.A.App. § 688 (the Jones Act) alleging gross negligence, and under general maritime law alleging unseaworthiness. Appellee claimed that he was suffering from delayed neurotoxic effects caused by the exposure to diazinon. Appellee's deposition testimony and the testimony

regarding his medical records indicate that appellee continued to suffer from eye problems, that he had trouble sleeping, that he was depressed, anxious, and had memory problems, that he had high blood pressure, and that he suffered gastrointestinal problems. Appellee's wife testified that appellee is depressed, is more irritable, has headaches, muscle weakness, memory problems, and has been unable to hold a job.

The jury found in favor of appellee on both claims and awarded appellee approximately $12.6 million including $1 million in punitive damages, and $1 million in exemplary damages for failure to pay maintenance and cure. The trial court awarded appellee an additional $1,871,728.00 in prejudgment interest.

In point of error one, appellant contends the trial court erred in denying appellant's motion for a new trial because there is insufficient evidence to support the jury finding that appellee suffered $8,576,000.00 in actual damages. Appellant concedes that appellee suffered short-term effects from the exposure to diazinon. Thus, appellant does not contest damages for the medical treatment appellee received in New Orleans in 1982 or for the loss of two days of work. Appellant does contest damages awarded for appellee's claim of delayed neurotoxicity on the ground that appellee's expert testimony was speculative and not based on reasonable medical probability.

A trial court has wide discretion in granting a motion for new trial. *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988). We must uphold the trial court's decision absent a showing of a manifest abuse of discretion. *Id.* Because appellant contends there was factually insufficient evidence to support the award of damages, we must consider, weigh, and examine all of the evidence. *Plas-Tex., Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). We may set aside the verdict only if the evidence is too weak to support the finding, or if the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965).

Appellant asserts that we must apply federal law to this case because appellee's causes of action are both federal causes of action. The Texas supreme court has stated:

> Where applicable *and* properly invoked, general maritime law preempts state causes of action and remedies, consistent with the longstanding desire of Congress and the judiciary to achieve uniformity in the exercise of admiralty jurisdiction.

*Texaco Refining & Marketing v. Estate of Dau Van Tran,* 808 S.W.2d 61, 64 (Tex.1991), *cert. denied,* 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 245 (1991). In *Texaco,* the court was determining whether a plaintiff could recover mental anguish damages, allowed under state law, but prohibited under general maritime law. *Id.* at 63. Because the court found that the plaintiff had properly invoked remedies under general maritime law, the court reversed the award of damages for mental anguish. *Id.* at 64. In *American Dredging Company v. Miller,* —— U.S. ——, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994), the supreme court made it clear that in exercising *in personam* jurisdiction in a maritime case, a state court may adopt such remedies and attach to them such incidents as it sees fit so long as it does not attempt to make changes in the "substantive maritime law." There, the court held that the doctrine of *forum non conveniens* concerned procedural as opposed to substantive law and that, therefore, the federal law on the subject did not preempt state law. *Id.* —— U.S. at ——, 114 S.Ct. at 983. *See also Exxon Corporation v. Chick Kam Choo,* 881 S.W.2d 301 (Tex.1994). Since the question of causation is one of substantive law, our review of the case law convinces me that federal case law regarding evidence of causation should control in this case.

Generally, however, Texas law is consistent with federal law regarding expert testimony on causation. To recover damages, a plaintiff must prove by competent evidence a causal nexus between the event sued upon and the injuries alleged. *See Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 732 (Tex.1984). "Causal connection ... must rest in reasonable probabilities; otherwise,

the inference that such actually did occur can be no more than speculation and conjecture." *Insurance Co. of North America v. Myers,* 411 S.W.2d 710, 713 (Tex.1966). *See also Gideon v. Johns–Manville Sales Corp.,* 761 F.2d 1129, 1137 (5th Cir.1985). Whether the evidence rests in reasonable probabilities depends upon the substance of the expert's testimony. *Myers,* 411 S.W.2d at 713. "Expert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanation, it becomes more likely than not that the condition did result from the event." *Lenger v. Physician's Gen. Hosp.,* 455 S.W.2d 703, 706 (Tex. 1970).

Toxic tort cases such as this present juries with questions upon which medical or scientific experts may disagree. *See Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 309 (5th Cir.), *modified on reh'g,* 884 F.2d 167 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990) (hereinafter referred to as *Brock I* and *Brock II* ). Whether a substance caused an injury is a scientific question that requires the testimony of expert medical professionals. *See Insurance Co. of North America v. Myers,* 411 S.W.2d 710, 713 (Tex.1966). An expert's testimony "must be based upon 'reasonable medical probability', as opposed to a mere 'possibility', since almost anything is 'possible' in the field of medicine." *Duff v. Yelin,* 721 S.W.2d 365, 370 (Tex.App.—Houston [1st Dist.] 1986), *aff'd,* 751 S.W.2d 175 (Tex.1988). Thus, if the proof consists of mere medical possibilities, it is insufficient to establish a causal connection. *Duff,* 751 S.W.2d at 176.

Confronting a challenge to the evidence of causation in a toxic tort case, the Fifth Circuit held that courts should "critically evaluate the reasoning process by which the experts connect data to their conclusions in order for courts to consistently and rationally resolve the disputes before them." *Brock I,* 874 F.2d at 310. In *Brock,* the Fifth Circuit analyzed the types of evidence regarding

causation typically offered in a toxic tort case. The court noted that the most useful and conclusive type of evidence is the epidemiological study which attempts "to define a relationship between a disease and a factor suspected of causing it. . . ." *Id.* at 311. Regarding such studies, the court added:

> To define that relationship [between a disease and its alleged cause], the epidemiologist examines the general population, comparing the incidence of the disease among those people exposed to the factor in question to those not exposed. The epidemiologist then uses statistical methods and reasoning to allow her to draw a biological inference between the factor being studied and the disease's etiology.

*Id.* As the court also mentioned, epidemiological studies do not necessarily exclude other possible causes for the same disease. *Id.* Two epidemiological studies of the effects of the drug Bendectin were admitted into evidence in *Brock. See id.* at 312. One study did not support a causal connection between Bendectin and birth defects. *Id.* The other study found a greater risk of birth defects, but that the risk was not statistically significant. *Id.* Because the plaintiffs did not present any statistically significant epidemiological proof that the drug causes birth defects, the court held that the evidence was insufficient to enable a trier of fact to make a reasonable inference as to causation.[1] *See id.* at 315; *Brock II,* 884 F.2d at 167.

In a later case, the Fifth Circuit again addressed questions about an expert's testimony regarding causation in a toxic tort case. *See Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992). In *Christophersen,* the trial court had excluded an expert's opinion that exposure to certain chemicals at a plant caused cancer. *Id.* at 1109. In determining whether the trial court erred in excluding this testimony, the Fifth Circuit set forth three threshold requirements for the admissibility of expert testimony: (1) whether the

---

1. In *Brock I,* the Fifth Circuit found "the lack of conclusive epidemiological proof to be fatal to the Brock's case." 874 F.2d at 313. On rehearing, the court changed this sentence and others indicating a requirement of conclusive epidemiological studies to a requirement of "statistically significant epidemiological proof." *Brock II,* 884 F.2d at 167.

witness is qualified to express an expert opinion on the topic at issue, (2) whether the data upon which the expert relies are of the same type other experts in the field reasonably rely upon in forming their opinions, and (3) whether in reaching his conclusion, the expert used a "well-founded methodology or mode of reasoning, one 'sufficiently established to have gained general acceptance in the particular field in which it belongs'." *Id.* at 1110–11. Even if the testimony meets these three requirements, it may still be excluded if the testimony's "potential for unfair prejudice substantially outweighs its probative value." *Id.* at 1110. *See also* FED. R.EVID. 403.

The trial court in *Christophersen* had criticized the expert's testimony on the grounds that the facts and data underlying the opinion were inaccurate and incomplete and that the expert offered no scientific methodology to support his conclusion. *Id.* at 1113–15. In reviewing these criticisms, the Fifth Circuit first found that the expert over-estimated the duration of the decedent's exposure to certain chemicals and had no accurate data regarding the chemical composition of the fumes in the plant where the alleged exposure occurred. *Id.* at 1113. Thus, the court agreed that the trial court could properly reject expert opinions founded on critical facts that are untrustworthy. *Id.* at 1114. The expert in question also testified that the kind of evidence most often used to establish causation are epidemiological studies, animal testing, and *in vitro* testing. *Id.* at 1115. Despite his testimony regarding the main methodologies, this expert offered no methodology to support his conclusion that the types of chemicals used at the plant were associated with the form of cancer found in the decedent. *Id.* Because the expert of-

fered no well-founded methodology to support his opinion regarding causation, the Fifth Circuit concluded that the expert's opinion was no more than a scientific hunch and was inadequate to support a judgment in favor of the plaintiff. *Id.*

Appellee contends that *Christophersen* has lessened the *Brock* requirements for evidence supporting causation in toxic tort cases. I disagree. Neither *Brock* nor *Christophersen* holds that epidemiological studies are required to establish causation in toxic tort cases; however, both cases note their importance. *See Brock I*, 874 F.2d at 313; *Christophersen*, 939 F.2d at 1115. Furthermore, both cases indicate that expert opinions unsupported by some type of well-founded scientific reasoning or methodology constitute mere speculation, insufficient to support a judgment. *See Brock I*, 874 F.2d at 315; *Christophersen*, 939 F.2d at 115. Both *Brock* and *Christophersen* have now been strengthened by *Daubert v. Merrell Dow, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Based on the standards set forth in *Brock* and *Christophersen*, and now *Daubert*, appellant contends the conclusions of appellee's experts amounted to speculation because they were unsupported by scientific studies or other well-founded methodologies establishing a link between diazinon exposure and delayed neurotoxicity. My review of the evidence leads me to agree. Appellee's syllogism,[2] which appears to have been adopted by the majority, is:

> Some organophosphates can cause delayed neurotoxicity;
>
> Diazinon in an organophosphate;
>
> Diazinon, therefore, must cause delayed neurotoxicity.

---

2. Appellee asserts and the majority seems to agree that because diazinon is an organophosphate, a scientific study that links any organophosphate to neuropathy or neurotoxicity should be sufficient to link diazinon to neurotoxicity. This rationale runs contrary to all commonly understood scientific principles. "Organophosphate" is a broad chemical family name that encompasses a diverse group of compounds. For example, ATP (adenine triphosphate) is also an organophosphate. ATP, however, occurs naturally in the human body, and relatively large amounts of ATP are essential for our metabolism

and energy production. Exposure to ATP certainly does not cause neurotoxicity; however, under the majority's rationale, simply because ATP is an organophosphate and scientific studies have linked some organophosphates to neurotoxicity, ATP must also be linked to neurotoxicity.

Diazinon is a distinct chemical compound, one of many different organophosphates, and is itself marketed under a variety of brand names (e.g., "Spectricide"). In fact, appellee's exhibit 63 lists over 30 different organophosphate pesticides in an appendix, each with its unique chemical name and composition.

This is a fallacy. The issue, as framed by the majority, is not whether organophosphates cause delayed neurotoxicity; the issue is simply: does exposure to diazinon, one of many organophosphates, cause delayed neurotoxicity?

While the United States Supreme Court was faced with the question of the *admissibility* of evidence in *Daubert*, the same principles the court there announced apply to *weighing the sufficiency of the evidence*. Indeed, in approving *Brock v. Merrell Dow Pharmaceuticals*, referred to above, the *Daubert* court sanctioned the reversal of the judgment for insufficient evidence of causation "rather than wholesale exclusion under an uncompromising 'general acceptance' test," noting that devices such as reversal of a judgment or direction of judgment are "the *appropriate safeguards* where the basis of scientific testimony meets the standards of Rule 702." (emphasis supplied). — U.S. at ——, 113 S.Ct. at 2798.

The *Daubert* court held that the subject of an expert's testimony must be "scientific knowledge." *Id.* — U.S. at ——, 113 S.Ct. at 2795. "Scientific," the court said, "implies a grounding in the methods and procedures of science;" and that the word "knowledge" "connotes more than subjective belief or unsupported speculation." *Id.* Finally, in order to qualify as "scientific knowledge," "an inference or assertion must be derived by the scientific method." *Id.*

*Daubert* commands that in determining whether the reasoning or methodology underlying "expert testimony" is scientifically valid, "many factors will bear on the inquiry." *Id.* — U.S. at ——, 113 S.Ct. at 2796. While not setting forth a "definitive checklist or test," the supreme court stated that the key question to be answered is "whether it can be (and has been) tested." *Id.* Other considerations are: (1) whether the theory or technique has been subjected to peer review and publication; (2) the known or potential rate of error; and (3) whether the conclusion

has been generally accepted in the scientific community. *Id.* — U.S. at ——, 113 S.Ct. at 2797. While the court recognized the inquiry is a flexible one, "[t]he focus of course, must be *solely on principles and methodology, not on the conclusions that they generate.*" *Id.* (emphasis supplied)

Appellee offered the testimony of four experts on the issue of causation. Dr. Edward Ezrailson, who holds a Ph.D. in biochemistry, testified that he has studied the effects of certain organophosphates on humans, using animal tests, for the Environmental Protection Agency. Dr. Ezrailson admitted that his EPA study was of the effects of malathion and parathion on the skeletal muscle protein metabolism in rats. No paper was published as a result of this study. Based on the amount and duration of appellee's exposure to diazinon, Dr. Ezrailson concluded that appellee's symptoms were caused, in reasonable medical probability, by this exposure.

On cross-examination, Dr. Ezrailson agreed that his research involved a review of the scientific literature. He testified that he relied, to some extent, upon the opinions of the authors writing the chapters in a textbook entitled "Toxic Effect of Pesticides." Dr. Ezrailson agreed with a statement in this text that individual compounds within a similar chemical class may range from extremely toxic to practically nontoxic. He also agreed with the statement that red blood cell cholinesterase, rather than that in blood plasma, provided a more accurate reflection of the inhibition of acetylcholinesterase in the nerve cells. Dr. Ezrailson testified that the average time for restoration of acetylcholinesterase in a person with diazinon exposure was two weeks to three months.

Dr. Ezrailson testified that he based his conclusion, at least in part, on his review of the scientific literature. Although Dr. Ezrailson testified about fourteen different scientific articles regarding the effects of exposure to organophosphates,[3] the record con-

3. Dr. Ezrailson's testimony referenced the following articles: (1) "Sequelae of Acute Organophosphate Poisoning" by Dr. I.R. Tabershaw, which concluded that exposure to certain organophosphates can result in delayed symptoms (did not list diazinon as one of the organophos-

phates studied); (2) "Delayed Neurotoxicity and Other Consequences of Organophosphates Esterase," by Ronald Baron, not admitted into evidence, noting that certain organophosphates have been shown to cause a delayed neurotoxic effect, but that this neuropathy is always pro-

tains only two articles that were actually admitted into evidence.[4] A review of the testimony indicates that only two articles addressed the effects of diazinon exposure, and these concerned fatal ingestion or poisoning. *None of the articles concludes that diazinon causes delayed neurotoxicity.* Testimony about the conclusions of some of the articles indicated that symptoms of delayed neurotoxicity caused by certain organophosphates usually occur within one to three weeks after exposure.

Another expert witness for appellee was Dr. Alfred R. Johnson, a Doctor of Osteopathy, who works at the Environmental Health Center of Dallas, Inc. This center provides health care to the public emphasizing the health effect and treatment of environmental exposure. Dr. Johnson testified that he has treated appellee and other patients suffering from exposure to diazinon or other similar chemicals. Dr. Johnson's diagnosis was "or-ganophosphate toxic exposure with relating damage in the form of delayed toxicity reaction and permanent nerve damage," but that he had not seen anyone, other than Ellis, who had delayed neurotoxicity from diazinon exposure. Dr. Johnson testified that exposure to diazinon can cause delayed central nervous system symptoms and that the length of time before such symptoms appear can vary with the individual from a couple of weeks to a few months. Dr. Johnson testified that, in his opinion, based upon reasonable medical probability, appellee's current problems were caused by the August 1982 exposure to diazinon. Dr. Johnson based this diagnosis on his examination of appellee and on a review of appellee's medical records showing exposure to diazinon and depressed levels of cholinesterase. Dr. Johnson testified that he was familiar with the literature regarding organophosphate poisoning, but he could not recall any studies dealing only with

ceeded by a period of approximately 7–14 days (article did not mention diazinon); (3) "Correlations Between Recovery Rate of Neurotoxic Esterases and Sensitivity of the Organic and Phosphate Induced Delayed Neurotoxicity," by Carrington, not admitted into evidence but does not even mention diazinon; (4) "Long Term Effects of the Organophosphate Sarin on EEG in Monkeys and Humans," by Duffey and Burchfiel, not admitted into evidence, stating that many, but not all organophosphates have been found to cause delayed neurotoxicity; (5) two articles by Finklestein entitled, "Brain Acetylcholinesterase After Acute Parathion Poisoning," and "CNS Involvement in Acute Organophosphate Poisoning: Specific Pattern of Toxicity, Clinical Correlates, and Antidotal Treatment," both of which concerned parathion and neither were admitted into evidence but does not consider or discuss diazinon; (6) "Anxiety Associated with Exposure to Organophosphate Compounds," by Levin, not admitted into evidence, which concerned effects on farm workers who received chronic exposure to organophosphates and found no relationship between exposure and depression; (7) "Behavioral Effects of Organophosphate Pesticides in Men" by Levin and Midski, not admitted into evidence; (8) "Spatial Memory Impairment and Central Muscarinic Receptor Loss Following Prolonged Treatment with Organophosphate" by McDonald, not admitted into evidence, which studied the effects following daily exposure to two insecticides, not including diazinon, over a fourteen-day period; (9) "Delayed Neurotoxic Effects of Some Organophosphorous Compounds," by Johnson, not admitted into evidence, delayed neurotoxicity manifests itself 7–14 days after exposure but not all organophosphates induce de-layed neurotoxicity; (10) "Evidence of Necrosis in Human Intercostal Muscles," by Wecker, Mrak, and Dettbarn, not admitted to evidence, which concerned a study of a man who received a fatal dose of malathion and diazinon but did not link diazinon to delayed neurotoxicity; (11) "Fatal Diazinon Poisoning in Man," by Hendricks, not admitted into evidence, which concerned a person who committed suicide by ingesting diazinon but did not link diazinon with delayed neurotoxicity; (12) "Central Actions of Organophosphate Agents," by Karczmar, not admitted into evidence, which studied the mental effects of exposure to certain organophosphates, not including diazinon; (13) "Organophosphate Polyneuropathy," by Lotty, not admitted into evidence, that concluded symptoms of organophosphate induced delayed neurotoxicity usually begin one to three weeks after acute exposure and lists six chemicals that cause delayed neurotoxicity but does not list diazinon.

4. The two studies admitted into evidence include: (1) "Chronic Neurological Sequelae of Acute Organophosphate Pesticide Poisoning," by Savage, Keefe, Mounce, Heaton, Lewis and Burcar, offered into evidence by appellee which evaluated the latent neurological effects of organophosphate poisoning on 100 patients, none of which had been exposed to diazinon; and (2) "Pesticides & brain-function changes in a controlled environment" by Rea, Butler, Laseter, and DeLeon, offered into evidence by appellant, which studied whether environmentally controlled conditions improve the symptoms of patients who have been exposed to pesticides, other than diazinon.

diazinon and the long-term effects of diazinon exposure on humans.

Appellee also called Dr. Francis J. Waickman as an expert witness. Dr. Waickman's area of specialty is pediatrics, but he has taken postgraduate courses in many areas, including allergy, toxicology, and clinical immunology. He is board certified in pediatrics, allergy, clinical immunology, utilization review and quality assurance, and environmental medicine. Dr. Waickman evaluates and treats people who have chemical sensitivities and who have been exposed to pesticides. In his examination of appellee, Dr. Waickman found symptoms of central nervous system involvement. Specifically, Dr. Waickman found slow verbal responses and below normal reasoning and recall. Based on his examination, Dr. Waickman testified that appellee's problems are delayed neurotoxic effects from diazinon exposure. Dr. Waickman testified that he is familiar with the scientific literature regarding diazinon and organophosphates and he has no doubts that these chemicals can cause long-term effects on human beings. Dr. Waickman, however, offered no case histories or studies of any kind, nor any personal experiences with patients or research, linking diazinon with delayed neurotoxicity.

Finally, appellee offered the testimony of Dr. Richard Austin, a clinical psychologist who has had experience treating people who have been poisoned by various chemicals. Dr. Austin personally examined and evaluated appellee, gave him a battery of psychological tests, reviewed the medical records of doctors who had treated appellee, elicited historical information from appellee's family and friends, and reviewed scientific literature regarding organophosphate poisoning. Dr. Austin concluded that appellee suffered nervous system damage resulting in emotional problems caused by the chemical poisoning in 1982. Dr. Austin was familiar with a study, admitted into evidence, that was performed on behalf of the EPA by Drs. Savage, Keefe, and others, entitled "Chronic Neurological Sequelae of Acute Organophosphate Pesticide Poisoning." This study involved testing of individuals chronically exposed to a variety of pesticides, not including diazinon. Dr.

Austin agreed that appellee suffers from many of the same impairments and exhibits similar test results to those discussed in the literature resulting from organophosphate poisoning. Dr. Austin testified that there are authoritative studies showing that organophosphate poisoning can cause delayed neurotoxic effects. The testimony regarding *these studies indicated no conclusion that diazinon causes delayed neurotoxicity.*

Finally, the majority relies upon the testimony of Dr. James Carter, described as "a family doctor" from Ellis' hometown. Dr. Carter, however, never treated Ellis until almost two years after his diazinon exposure. While Dr. Tim Lee Carter (Dr. James Carter's uncle) purportedly saw Ellis five or six months after his exposure, there is no documentation of that visit in *any* medical records. The first indication of a visit even to Dr. Tim Lee Carter is a letter Tim Lee Carter wrote to appellee's counsel in August of 1983. That letter does not describe any of the symptoms Dr. James Carter later claimed Ellis had; instead, it merely asks appellee's counsel to keep him apprised of any progress in the litigation. There is then a record of three visits in 1984. Dr. Tim Lee Carter prescribed an antibiotic in February, associated with a complaint of fever, another antibiotic for a cold in May, and later prescribed Tagament, used in treating peptic ulcers, in October. Dr. James Carter saw Ellis briefly for the flu in May 1984 and did not see Ellis again until 1986. Other than visits for an ingrown toenail and bronchitis, Dr. Carter's medical records are unremarkable.

Unlike the expert in *Christophersen*, the expert witnesses here based their opinions on accurate underlying facts, such as estimation of the duration of appellee's exposure to diazinon. Thus, we should turn to whether there was sufficient evidence supporting the experts' testimony that, in reasonable medical probability, diazinon caused the injuries alleged by appellee. *Brock* and *Christophersen* require that an expert's conclusions regarding causation rest upon a well-founded scientific methodology. *See Brock I,* 874 F.2d at 315; *Christophersen,* 939 F.2d at 1115. *Daubert* requires that an expert's con-

clusions regarding causation rest upon "scientific knowledge." ―― U.S. at ――, 113 S.Ct. at 2795. Appellee's experts all testified that they based their conclusions on past experience treating patients exposed to organophosphates and/or on published scientific studies showing a connection between exposure to organophosphates and delayed neurotoxicity. These experts admitted, however, that none of the published studies documented a connection between delayed neurotoxicity and exposure to diazinon. Only one study referenced by appellee's experts addressed diazinon and this study concerned a fatal ingestion of the pesticide and not whether a less than fatal exposure can cause delayed neurotoxicity. Testimony also indicated that the effects of exposure to compounds within a similar chemical class can vary widely.

Appellant presented the testimony of three doctors, Dr. Velma Campbell, Dr. Eric Comstock, and Dr. Francisco Perez. Dr. Campbell treated appellant in the emergency room at the New Orleans General Hospital. Campbell testified that some pesticides can cause delayed neurological symptoms, but that to her knowledge, diazinon is not one of these.

Dr. Perez is a clinical psychologist specializing in neuropsychology and behavioral medicine. Perez did not examine appellant, but reviewed his medical and psychological records and reviewed the literature regarding organophosphates. Perez testified that a worsening of a patient's psychological condition is not a typical symptom caused by exposure to diazinon. Perez concluded, based on his review of the records and literature, that appellant's symptoms are most likely unrelated to the diazinon exposure.

Dr. Eric Comstock, a medical toxicologist, testified that he had experience treating persons exposed to toxic substances, 80–100 of which involved diazinon. Comstock also reviewed appellant's medical records and the literature about organophosphates, but did not examine appellant. Comstock agreed that appellant initially exhibited mild acute effects from the exposure, including eye irritation, slight weakness, diarrhea, headaches, and vomiting, but based on his experience and review of the records and literature, Comstock concluded that appellant has suffered no delayed effects related to the diazinon exposure.

Comstock testified that diazinon is an "unrestricted use" pesticide, which means that it does not cause or has not been shown to cause severe, impairing long-term effects. Comstock noted that his personal experience treating persons exposed to diazinon has not indicated that diazinon causes delayed neurotoxicity. Furthermore, Comstock testified that diazinon has been widely used by the public for many years and that, if it caused delayed neurotoxicity, this would have been identified. Finally, Comstock testified that none of the literature supports the conclusion that diazinon causes delayed neurotoxicity, and that there is literature concluding diazinon does not cause delayed neurotoxicity.[5]

Even if expert testimony rests upon a well-founded methodology, it will nevertheless be insufficient to support a finding of causation if the studies or tests fail to show a statistically significant relationship between exposure to the substance and the kind of injury alleged. See Brock I, 874 F.2d at 315; Brock II, 884 F.2d at 167. Although the studies relied upon by appellee's experts support a conclusion that certain pesticides falling within the organophosphate classification can cause delayed neurotoxicity, these studies do not establish any relationship, statiscally significant or otherwise, between diazinon and delayed neurotoxicity. Absent a well-founded scientific methodology showing some connection between exposure to diazinon and the kind of injuries alleged by appellee, the conclusions of appellee's experts regarding causation were speculative and insufficient to enable the jury to make a reasonable inference as to causation. See Brock I, 874 F.2d at 315; Brock II, 884 F.2d at 167. None of appellees experts had ever seen or treated a single person with "delayed neurotoxicity" due to diazinon poisoning. Despite over thirty years of diazinon's wide use, including use

5. Comstock specifically noted that the article entitled "Poisoning Due to Organophosphate Insecticides," (author unknown) concluded that diazinon, as well as certain other insecticides, did not produce neuropathy.

as a common household pesticide, the appellee's experts could not point to a single case history, animal study or *in vitro* study—much less any epidemiological study on humans—to link diazinon as a cause of delayed neurotoxicity. The majority has not undertaken the review commanded by *Daubert* of the "reasoning or methodology underlying the testimony" to assess its scientific validity. Because there is no "scientific knowledge," as commanded by *Daubert*, concluding that diazinon causes *delayed neurotoxicity*, appellee's damages should be limited to those resulting from short-term exposure. Consequently, appellant's first point of error should be sustained.

The majority dismiss appellant's complaints on the amounts of damages awarded for past and future medical expenses, past and future physical pain and mental anguish, and past and future physical impairment with the bare conclusion that all the evidence has been considered and we "find it sufficient to support the jury's findings." I disagree.

The jury awarded $38,000 for past medical expenses and $850,000 for future medical expenses. In point of error 13, appellant sought a new trial or a remittitur based upon insufficient evidence. I believe appellant is entitled to a remittitur as to future medical expenses for two reasons. First, there is insufficient evidence, as discussed in the first point, that appellant's injuries resulted from exposure to diazinon. However, there is the further reason that the award of $850,000 is excessive. Dr. Johnson, an osteopath, testified appellant's future medical expenses would probably be $600,000,[6] based upon a $10,000 a year program of vitamin C injections, regular doctor visits, clean living, and sauna-type therapy. This award is shockingly excessive.

The jury awarded $228,000 for past physical pain and mental anguish and $4,000,000 for future physical pain and mental anguish. In point of error 14, appellant sought a new trial or a remittitur based upon insufficient evidence. In addition to the reasons discussed in the first point, I believe appellant is entitled to a remittitur.

Appellee did not testify at trial. His mother testified that "at times he feels better but he has a lot of headaches and so much chest pain but has times he has felt better for a short period." Other than headaches and chest pain, appellee complains of stomach aches, insomnia, muscle aches and memory loss. This 4 million dollar award is shockingly excessive. Further, appellant argues and I agree, the awards for physical pain and suffering and for physical impairment (point of error 15) are cumulative. These awards compensate appellee for an identical injury. The only "physical impairment" that appellee can assert is the impairment due to physical pain—aches and pains and nausea. In the same vein, the only "suffering" appellee can assert is due to these very same symptoms. This is not a case of an appellee suffering actual physical damage or disfigurement, for there is no evidence of either in the record. Thus, the injuries in this case—pain and suffering and physical impairment—are indistinguishable, and to award damages for both permits a double recovery. I believe appellant is entitled to a remittitur.

The jury awarded $250,000 for past physical impairment and $1,000,000 for future physical impairment. In point of error 15 appellant sought a new trial or a remittitur because of insufficient evidence.

In addition to the reasons discussed in the first point of error, there are additional reasons why appellant's point is well-taken. Appellee offered no evidence that he has suffered or will suffer actual physical impairment. The only medical tests ever conducted on appellee, including neurological tests such as EEG and peripheral nerve tests, have been normal. The evidence offered—limited to appellee's descriptions of his symptoms, and opinions that his verbal responses are "slow," and that he "looks older than his chronological age,"—is insufficient to support an award for physical impairment. To recover for past and future impairment

6. Dr. Austin, the psychologist, estimated appellee's future psychological treatment costs to be $250,000.

[the] injured party must sustain the burden of proving that the effect of his physical impairment extends beyond any impediment to his earning capacity and *beyond* any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated.

*Allen v. Whisenhunt,* 603 S.W.2d 242, 243 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ dism'd) (emphasis added). In this case, Ellis has not proved that the effect of his impairment extends beyond any pain and suffering and loss of earning capacity. *See also Valdez v. Church's Fried Chicken,* 683 F.Supp. 596, 615 (W.D.Tex.1988) (no recovery for physical manifestations—avoidance of stimuli, difficulty sleeping, etc.—related to the mental anguish). I believe appellant, at the very least, is entitled to a remittitur.

For all the reasons discussed, I respectfully dissent.

MURPHY, J., concurs in this opinion.